I'm going to address the 404B issue, the failure to strike, the risk of death allegations, and the exclusion of the statement of present intention. Can I come to that second point first? I want to make sure I've got this straight. We've got a situation where your client in May is in a car where someone is in a very similar situation. Less than three months later, his friend, he says to his family he's going to help them, he's going to get the truck. He gets the truck from his good buddy, Chewy, whose last name he doesn't know and address he doesn't know. Before he gets the truck, he goes and uses some methamphetamine. He knows he's too late to help the family, but he gets the truck anyway. He gets it, and his good buddy, Chewy, now gives him the truck with a gas gauge down, doesn't tell him that the person is in the truck, takes the risk that your client is going to try to gas up the truck, thereby killing the illegal alien, and indeed subjecting him to possible manslaughter charges, not only cutting out Chewy's $3,000, turns him loose with that. Your client shows up at the border sweating, doesn't notice that the gas gauge is down, never tries to fill it with gas, and now you're saying the risk of death allegation is harmful error and distorted this whole trial. Does that pretty much cover it? Well, I wouldn't characterize the evidence. Not going with all that, are you? Ultimately, your conclusion is correct. Yes, I think that is true, and I think that there are a lot of responses to some of Your Honor's characterizations of the evidence. For instance, Mr. Mendoza testified that he believed that there still was a benefit to be gained from his family for him getting the car, even though you're correct, he was going to be late. In fact, his family testified that the move actually extended into the next day. Didn't his son testify that he was already mad at him, he was too late, and he didn't show up on time? His son was definitely angry with him. There's no question about it because he didn't show up on time. But there was still value for him showing up when he was planning to do it. Now, I think that the thing about the construction of the compartment that Your Honor brings up and the fact that gas could have gone into it, I agree that we have to live with that. I think that that's what the Schemenauer case talks about. But I think that the reason that we had prejudice in this case was that the alien's actual subjective experience of the ordeal was put into evidence, and that was not relevant under Schemenauer theory. But it wasn't emphasized, and I forgot the name of the other case, with the individuals who suffered the heat stroke. Mr. Gonzales. Right, Mr. Gonzales. Here, all that was really pointed, there wasn't great emphasis on the fact that she was sort of inert when she was kind of pulled out. I mean, nobody hit that heavily as was true in the other case. Here, where she was in the car was going to come out because didn't that really go to knowledge? I mean, are you really, and that was the point I was making in my litany at the beginning, are you really going to turn somebody loose with a car where they could kill your golden goose, if you will, by putting gas in it without telling them, hey, whatever you do, don't put gas in the gas tank. Doesn't that strain credulity rather considerably, especially when this was within three months of the time that your client was in a car where the same thing happened? Well, that last piece of evidence never should have come in. But with respect to the evidence, okay, look, they can draw an inference from the construction of the compartment. I think Schemenauer says that they can do that. What they can't draw an inference from is the testimony that she was suffocating, that her feet were burning, that she smelled gas, all the stuff about her own subjective experience of the terror. That's not relevant to the decision as to what sort of driver you're going to hire to drive your van, whether or not you're going to use a knowing or unknowing driver, because those are events that take place after the arrangements to drive the van take place. And I strongly disagree with Your Honor's suggestion that this evidence wasn't emphasized. And I would go back to the government's closing argument in its rebuttal, in its closing summation. Mr. Mendoza, quote, has no regard for the safety and well-being of people jammed into specially modified gas compartments. That's what this case is all about, close quote. And that's at ER 148. But that could be drawn from the compartment itself. That's not emphasizing that she was hot, that there were only those two quarter-sized panels to breathe or holes. I mean, that was just emphasizing you're down below the car, you're 12 inches above the ground. I think that goes to the entire piece of all the evidence that they put in. They argued that the instructions that were given to the jury emphasized that, telling them to find out whether or not Mr. Mendoza intentionally or recklessly created a risk of death. The special verdict form told them to do the same thing. So the jury was clearly focused on that aspect of the evidence. And the government's post hoc rationalization for putting it in, that it was relevant to intent, if that had actually been what the evidence had been offered for, there could have been limiting. To knowledge. Right, to knowledge. Then there could have been limiting instructions given to focus the jury on that use of the evidence. But that instruction was never given because it was improper, given the fact that the district court believed that the risk of death was an element. But let me backtrack to the 404 bulletin. Well, it was an enhancement. Are you disagreeing under the Watt that time, under Amelie, that it should go to a jury? So in other words, you're complaining that this went to a jury and was determined beyond a reasonable doubt. Yes, yes I am. And I think what you're saying was, was the district court's call right at the time it was made? Probably, given the Ameline decision. But the bottom line is, is that Booker came along afterward, basically said that the Ameline approach was not correct. But one of the alternatives in Booker, in Booker II, was one thing we can do is keep trial by jury on the guidelines. The other is we can make them advisory. We're making them advisory. Does that automatically mean that if you had a trial by jury under the old law? Usually what we get back is a judge decided it was mandatory and imposed certain guidelines on it. Here, it's a little different. We have a judge who said, okay, fine, I'm going to follow the law, and I'm going to give you a trial by jury beyond a reasonable doubt. You're getting all the benefits. I'm not going to sit here and make that determination. You're not complaining about the sentence in terms of mandatory or not mandatory. You got a trial by jury, and now you're complaining about it. If we had said, judge, we want that, we want our 6 amendment rights vindicated to have this guideline determination, then I would agree with you, Your Honor. But we made a motion to strike that allegation. It should have gone out. Booker makes clear now, and it's applicable to cases pending on direct review, that the district court was not prescient enough. So it was wrong. That's the bottom line. And it doesn't matter that it's not really fair to the district court, because hindsight is 20-20, but he was wrong when he denied that motion. And all this prejudicial evidence came in. Well, he was right, but you're just saying Booker now says you have to reverse that, right? Yeah, he's retroactively wrong, right when he did it. Okay, but getting back to the 404B, Garcia Orozco. From Non-Protect. Exactly. Garcia Orozco is on all fours with this case. Garcia Orozco is a case where the defendant was initially arrested as a passenger with a car that had drugs in it, and then was later arrested as the driver with a car that had drugs in it. It's basically the same fact pattern we have here, except that instead of drugs we're dealing with aliens. But it's the same type of analysis. And I think that the key passage in Garcia Orozco says there is no logical basis from which to infer that Garcia Orozco knew that the suburban contained drugs because drugs were found in a car in which he was previously a passenger. But in Vivo Rodriguez, the conclusion was that where there was cocaine in the roof panel and it also transported marijuana in a door panel of a car, that's okay. Driver-driver case, though. But still, here you've got within a three-month period, he was a passenger in a car where exactly the same thing was done. He now gets a car that's not his own, doesn't check it, gets it under circumstances. He says that Chewy is a friend. Looks a little bit marginal on that since he can't identify his name, address, etc. And now you're saying this is not sufficiently similar. I mean, I think there's a difference between this and Garcia Orozco in terms of the circumstances, similarity, time frame, everything else. I don't think there's any showing at all of similarity here. If you look at the record, what the government did was they put in two witnesses in their case-in-chief. One witness testified that he's the guy that saw Mr. Mendoza running away from the scene. And by the way, Garcia Orozco ran, too, in his passenger incident. So that doesn't change anything, contrary to what the government said in its brief. And they had another witness who testified that he processed them later on. The only witness who actually testified about Mr. Mendoza being in the car was the witness who was called during the defense case who testified that he thought that Mr. Mendoza was intoxicated and he had two syringes on him. That guy didn't say anything about where the alien was in the car. He couldn't remember the car. Basically, all he could say was that the car was small. So he didn't say anything about the alien being in a compartment. He didn't say anything about the alien being concealed in a manner similar to what happened in this case. So I would respectfully disagree that there's any showing of similarity here at all. But the key thing is, is we've got a situation where he is the passenger. And I think that getting back to Ski Valley, your question, Your Honor? I've been called worse. Your question was basically Mr. Mendoza was in a situation where, you know, fool me once, shame on you. Fool me twice, shame on me. And that's basically he should have been suspicious based upon his previous experience. But if you look again at Garcia-Roscoe and again on the same page, 1304, whether Garcia-Roscoe should have been suspicious of the request to drive the vehicle across the border is a separate issue and not logically related to the prior incident. So the idea that he should have been suspicious based upon his previous passenger experience is directly foreclosed by Garcia-Roscoe. So you have both the knowledge aspect and the he should have been suspicious aspect both foreclosed by Garcia-Roscoe. And I'd like to we've talked a lot about the really bad evidence in the case. I'd like to talk about the good evidence in the case, which is that Mr. Mendoza had an exculpatory account. He testified to it. And he had corroboration, substantial corroboration from his family. They were moving that day. They were expecting him to help. Can I go back to Garcia-Roscoe? As I recall, in that case, the first situation, this was not a transport across the border, or was it? I'm trying to remember. No, I think it was a checkpoint or a stop on the interstate. Okay, thanks. Good. But I don't think that changes the circumstances. You still have a situation. I haven't said it did. I just wanted to make sure I was correct. Okay. Okay, great. Thank you, Your Honor. I think that this is a case where the defense put on a strong defense. They had the defendant getting up and testifying that he wasn't guilty of the offense. The reason that he went to Mexico was to borrow a van. You had two family members come in and corroborate that. Not as much as they should have been able to, because some of the son's testimony was excluded. And the prosecution- Wasn't that a harmless error? That was one of the concerns I had, was he testified that his father was supposed to be there. He testified he called his father. He was angry that his father didn't show up. Didn't you really get all of the probative information you needed to go to the jury on that without further gilding the lily? I mean, it was pretty clear that the son was corroborating that the father was getting the truck to come and help him out. I think the thing that's really key about that is it gave the jury a really stark choice. Is Mr. Mendoza a really masterful criminal who goes to the trouble of cynically using his own family by planting the seeds of his defense, even before he commits the offense, and then goes and has his ready-made defense when he goes to trial? Because that's what they would have to believe. How would the additional evidence having him testify that he talked to his father change that? Because that would have- He said he knew ahead of time that his father was supposed to pick up the truck. Because that would have established that they had an actual conversation in which he actually provided this information to his son. Do you think the jury assumed that his son got a Ouija board and figured this out? Well, the son could have heard through the wife. The son could have acquired the information in any way. Could have even heard it from- Could have been a contender. Could even have heard it from the lawyers after Mr. Mendoza's arrest. But the bottom line is when you place that before the arrest, that makes Mr. Mendoza an extremely careful criminal, if in fact he is a criminal. But anyway, you have a situation where there is a defense that's put out. It's exculpatory. It's corroborated by people that the government had no quarrel with. And that's at ER 146, who testified that- And the government agreed that his testifying family members were good and decent. That's also at ER 146. So you have very credible people coming in and corroborating the defense in the case. So I think that there is no argument here that the error is harmless. I see I only have two minutes left, so if I could reserve, I would like to. Fair enough. Thank you. We'll hear from the government. Good morning. May it please the Court. Your Honors, my name is Stephen Tokars, appearing on behalf of the United States. Your Honors, the bottom line in this case, when the Court looks at the record and the trial that was conducted, only one conclusion can be drawn. That is that the defendant, the appellant here, Mr. Mendoza, received a fair trial in this case. He was able to present his theory of the defense through his witnesses. He chose voluntarily to take the stand, and he testified to his story and to his denial of knowledge. The jury considered that testimony, and they rejected that testimony by finding him guilty. The defendant in this case now is trying to complain that he did not receive a fair trial, that he was prejudiced. However, on each count that he's complaining of, the record shows that the district court acted properly and that the jury rejected his theory of the case. I'd like to start with the 404-B evidence. Are you saying Booker has no impact on the risk of death enhancement that was sent to the jury? No, Judge Giovelli. I acknowledge that Booker caused a change in the case law and that the decision to send that special allegation to the jury would be incorrect at this time. However, my position is that that evidence that came in was still relevant and probative to the government's case in chief. That may be, but don't we also have the added factor that because it was alleged and sent to the jury, there was a jury instruction on it, which it wasn't used just for knowledge in a situation like this. This isn't the typical 404 we're trying to get this evidence in. There was an instruction on that that went to the jury. So didn't that enhance the error? Doesn't that make it a little bit different? I respectfully don't think so, and the reason being that the instruction that went to the jury was limited. It was one part of the jury's finding. They first had to determine whether the defendant was guilty or not. Only then were they instructed to consider the special allegation, and only then were they to turn to us. But, of course, it's the defense's position that getting that information, that evidence, and the instruction may have tainted the precursor finding on guilt. They're sitting there. They've got the jury form. They've got the special verdict form. They know there's going to be a question on whether or not the special allegation is true.  The defense, of course, says yes, impermissibly taint the finding on guilt. I understand that the defense position is one where this court would have to presume, essentially, that the mere inclusion of that special allegation instruction to the jury so tainted them that it more likely than not affected the verdict here in this case. However, the government's position is that this evidence was going to come in in any event, and the jury was going to hear this evidence, and they heard the evidence. I mean, how would that evidence have come in about her subjective experience once inside the car? I mean, that was pretty gruesome testimony, but it really had nothing to do with knowledge, did it? And what was the probative of? I guess maybe I'll put my question a different way. The probative value of the testimony that the material witness provided, and it was specifically that she had difficulty breathing, that her feet were hot, were burning, and that she had no padding, I believe, in the compartment was what she had testified to. And I would note that that was actually fairly limited testimony. Right, but what did it go to in terms of the elements of the crime? What did it show? It's the government's position that that went along with the design of the van and the special compartment to show that the unique nature, and this is really the bottom line of what distinguishes this type of case, I think, from other 404B cases that talk about drugs, the unique nature of having a human being being smuggled changes the evaluation of the case because a human being can expire, a human being can die, especially when they're in a situation that the material witness in this case was in. She was in a situation where her life was at risk just by being in that special compartment. But how does that go to what the defendant knew? Assume the defendant gets in the car. Assume Chewie was a buddy, close friend, said, listen, drive the car. He gets in the car. Now, the information about where the compartment was, how the gas tank would be filled, all of that would be relevant to his knowledge, and I understand that argument. But how does what she was going through have anything to do with whether he knew she was in there? It wasn't like she was beating on the gas tank or anything. So how is the fact that her feet were hot, that she was in a closed compartment, that it may have been a couple of hours, that she had limited breathing, how does that go to he knows that she's in there? It goes to his knowledge because a smuggler would not place a material witness in those kind of conditions without telling a driver that they're in those kind of conditions. But that would go to the gas tank and the heat, I mean, the gas tank and how it was filled and everything else. It doesn't – her feelings have nothing to do with that. I mean, I understand the argument that a smuggler would have told him, the driver, look, whatever you do, don't fill the gas tank. You've got to fill it in the sink. It's not going to work. The gas, the register is all the way down at zero in order to protect the illegal alien and gain the financial gain. But how does her feelings have anything to do with that? Well, I think the reason it's relevant is because her feelings, granted, they're her subjective feelings. However, they are foreseeable that anyone in that type of compartment with no padding, that size, that far off the ground with two little air holes is going to have those experiences. Why is that relevant to the elements of the crime? I mean, I understand why it's relevant in the context of this case because you were putting that issue in front of the jury for a different reason. But now with Booker and going back in time, it's a bit unfair. But on the other hand, it seems to me, let's take, for example, let's assume it's just marijuana in there. Same case. It wouldn't make any difference. I mean, the question is design and so forth. I just don't understand the argument that her extreme situation is relevant to showing his knowledge once she's in there. And it couldn't be because the guy didn't know. He didn't know what her feelings were going to be and what her response was going to be until after the fact. So at the time he entrusted the car, he couldn't discuss. By the way, her feet are going to be burning. She's going to. That was not known to the teller until after the fact. Does that complicate your position? I do respectfully disagree, Judge Ferris, because I think it is foreseeable that if you put someone in a metal compartment where they're lying under a van, that their feet are going to be burning. I'm just suggesting you can't communicate it with a degree of certainty so that the person can say, all right, this goes to knowledge. The bottom line, Your Honors, is that that testimony was very limited in this case. It was short, brief testimony. And, in fact, an interior witness conceitedly contradicted herself on cross-examination. She did say, and the defense did bring out, that actually she could breathe okay. I don't think in the context of all the evidence that was presented that this court can conclude that that evidence by itself, that additional evidence that the material witness testified to, her subjective experiences, so far tainted the verdict in this case to cause reversal. Because the jury heard all of the evidence about the design of the van, and they knew that just the actual driver driving that van with the gas tank on E, it's completely implausible to think that he's not going to pull over and try and fill it up. And he has to know that he can't do that, or the entire ends of the smuggling operation are immediately defeated in this case. So in the context of all the evidence that was presented, I would submit that that limited evidence, which was not unduly emphasized during the trial, did not taint the jury's verdict in this case to an extent. Except that, you know, it was the subject of a lot of discussion and closing argument. Well, the subject, I believe that the closing argument, and I did give the closing argument, and as I recall from reviewing the record, my focus was more on the design of the van in the closing argument, and was the fact that this unique design, which is really a design that could only put the material witness at risk under these circumstances, where an unknowing driver, the first thing they would do would be to fill up that tank. That was really the thrust, as I recall, of the government's closing argument. But you just said two things. You said the risk, and then filling up the tank. The risk part, weren't you, in essence, arguing your enhancement? And that was why you were, so there was a fair amount of discussion in the closing argument, because you wanted the jury to find true the enhancement. I mean, I understand why you argued it, because you were arguing for the enhancement. I mean, I don't see any problem with your argument, except through the unfair lens of Booker. But now here we are. I'm responding to your argument. You said, well, it just came in briefly. It wouldn't play into consideration in the trial. Well, no, you're trying to prove beyond a reasonable doubt that there was a substantial risk of death in the case. And the jury did find beyond a reasonable doubt. But the question for us is then looking through the unfair 2020 lens of Booker, whether that was prejudicial. So it's a tough question. And on that issue, I guess the only thing further I could say is that, of course, I did address specifically the special allegation in my closing argument. It was part of my burden of proof at that time. So I did bring that to the attention of the jury. However, I still think if you review the record and review the closing argument, you'll see that the focus of the closing argument was not the material witness's testimony about her feet burning and her being unable to breathe. I recall there was an instruction to the jury that they had to find guilt before they reached the issue of risk. But there was no instruction that you had to find it separate and apart from the evidence of risk, right? I'm trying to remember what the instruction was. Well, I believe the instruction was. I know that you had to find guilty of the offense before you even deal with the question of risk. Right. And that they were separate. But I wondered whether there was any discussion about in the order in which you considered or how you'd use that evidence and not to use it on guilt. I think the instruction was simply that, Judge Chiavelli, that the order was said that you do need to make a finding of guilt first before you consider the special allegation. So I think that supports the review of the record showing that this evidence, this limited evidence did not impermissibly taint the jury's verdicts and that they had to go in order to make the judge's findings. It's true, of course, they had heard the evidence and they had heard some comment on it from me. But the bottom line for them, for the jury, was as a finder of fact, did the defendant know? And in considering that question, they had heard the defendant's testimony. They had heard the son's testimony. They had heard his ex-wife's testimony. They had rejected that theory clearly. And they had looked at all of the evidence, including the design of the van, which was the highlight of the government's circumstantial knowledge evidence. I'd like to hear a little bit, if I might, change the subject. I think we have a similar issue that was discussed earlier today on the Munoz question of an incorrect jury instruction on financial gain and its impact, both on the conviction on that charge and or on the aiding and abetting, which was, of course, here, unlike I think in the other case alleged in the indictment. Yes. Thank you, Judge Chiavelli. On the jury instructions on financial gain, just overhearing, and I have to say, I wasn't familiar in advance with the facts of that case. But just overhearing the argument, it sounds like the instructions were similar to the ones that were given here. And I would submit that those instructions were proper. They were not deficient. The reason being that the jury was first instructed by the pattern instruction that they did have to find that the defendant acted for financial gain. They were then instructed that under aiding and abetting theory, under the pattern instruction, that they had to find that the defendant specifically intended to aid and abet every element of the commission of the crime. That's proper. I guess the language that's being disputed is the language from United States v. Engwin, I believe, where they talk about that's a separate definition of what the term commercial benefit means. And that instruction was a paragraph given after the instructions of the elements, which did say that commercial benefit can mean any benefit. It can mean the defendant acting. It does not require that the defendant acted for financial gain, just that someone did. Now, that instruction, that paragraph by itself, I don't think impermissibly taints the proper instruction, the elements that were given, and the proper aiding and abetting instruction. Because the court is aware we do have to consider the jury instructions as a whole and how the jury would read the instructions as a whole without isolating one subject. Also, I would submit that the proper reading of that little paragraph from Engwin is simply stating that, which is true, the defendant doesn't have to have already benefited. The language is past tense. You don't have to find the defendant acted. You don't even have to find there was an agreement to pay. You simply have to find that the defendant, in his mind, subjectively intended to benefit. Now, whether there was any devices in place for an arrangement for the payment, for where to go to pay, for how to receive the payment, makes no difference, as long as you find he had the subjective intent to benefit. And for the aiding and abetting, the defendant would have to know somebody's going to benefit. That's correct, Judge Givaldi. And in this case, I would point out that in the record, the evidence does support a finding also, not only on aiding and abetting, but that the defendant himself, the appellant here, personally acted for financial gain. And there is strong circumstantial evidence based on the defendant's own testimony, and this was a defense tactical choice to inject this into the trial, that they were going to inject the defendant's drug use into this trial. They brought it out. They made the decision. The government didn't do that. But once they brought that out, they immediately brought out a motive for the defendant to do the smuggling. And I commented that on closing argument. I believe it's a proper inference for the jury to draw that a defendant who has a drug habit, an admitted drug habit, hard drug habit, has a financial motive to commit a crime such as this, has a financial motive to take the risk of being caught because of his habit. So in this case, I think this Court can also find, even if it finds some error in the instructions, that the jury in this case very easily could have found, and I argued this in my closing argument, that he did, in fact, act for personal financial gain. So that there is no problem here either way, the government submits. I see I have a few seconds. So in closing, Your Honors, I would just submit that the trial in this case was fair. The defendant presented all of his evidence, and the jury rejected that evidence. And we'd ask you to affirm the verdict and sentence. Thank you very much. The tactical choice to bring out the drug use, of course, was necessitated by the admission of the improper 404B. That was the defense to the trial within a trial that Mr. Mendoza was forced to undertake when he had to defend against the passenger incident. Which, by the way, if he had gone to trial on that directly, would have been given a Rule 29 judgment of acquittal because there was absolutely no evidence. And in passenger cases, without a confession or some additional evidence, a Rule 29 is granted routinely under cases like Sanchez Mata. So that tactical choice was necessitated by the erroneous admission under Garcia Orozco of that evidence. Now, with respect to Mr. Mendoza's credibility, again, this is a case where he testified, and the admission on his part to defend against the 404B charge clearly undercut his credibility. He had to talk about the drug use. Actually, what happened in this case was before this 404B evidence was allowed in by the district court, the defense made a motion to eliminate or preclude any evidence of drug use. So really, the whole drug use thing got turned around completely by the 404B evidence and clearly worked to prejudice Mr. Mendoza in his trial. Now, with respect to the compartment itself. Well, he did testify that he had been using methamphetamine that day. He testified that in the prior incident, he had been using drugs. This was not exactly something that only came out in response to the 404 evidence. He testified that on the day he was supposed to help them, he was using meth, he was late, et cetera. So he brought that out, didn't he? The defense moved to preclude any type of admission of that evidence. So once the fact that the evidence came in and the evidence of him having the syringes and the agents thinking that he was intoxicated, once that came in. No, I'm not talking about the syringes. I'm talking about he testified that on the day of this incident, he was out using methamphetamine. That was why he was late. Right, but if the evidence came in, it hadn't come in on the 404B, there's no reason that the defense would have elicited that evidence. Now, with respect to the government's use of the ordeal evidence, that's at ER 144. They included that in their closing argument. And I think that when you have evidence that's of limited probative value, even a slight chance of prejudice under Gonzalez-Flores is indicative of error. So, again, we have a case here where the guy testified that he was innocent. He provided evidence to corroborate it. I think that we can't say that the errors are harmless under these circumstances when there are two very significant errors that have been established. Thank you. Thank you very much.
judges: Farris, Thomas, Schiavelli